# United States District Court
# Eastern District of Wisconsin (Milwaukee)
# CIVIL DOCKET FOR CASE #: <u>2:17–cv–00482–PP</u>

West v. Kind et al
Assigned to: Chief Judge Pamela Pepper
Demand: $1,000,000
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 04/04/2017
Date Terminated: 03/09/2020
Jury Demand: Defendant
Nature of Suit: 555 Prisoner: Conditions of Confinement
Jurisdiction: Federal Question

**Plaintiff**

**Rufus West**
*also known as*
Muslim Mansa Lutalo Iyapo

represented by **Rufus West**
225213
Green Bay Correctional Institution
PO Box 19033
Green Bay, WI 54307–9033
PRO SE

V.

**Defendant**

**John Kind**
*Security Director*

represented by **Rebecca A Paulson**
Wisconsin Department of Justice
Office of the Attorney General
17 W Main St
PO Box 7857
Madison, WI 53707–7857
608–266–0278
Fax: 608–267–8906
Email: paulsonra@doj.state.wi.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Warden Scott Eckstein**
*Warden*

represented by **Wisconsin Dept of Justice – 1983 Actions**
Email: DLSFedOrdersEastCL@doj.state.wi.us
*TERMINATED: 10/01/2018*

**Rebecca A Paulson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pete Ericksen**
*TERMINATED: 07/31/2018*

**Defendant**

**Brian Foster**
*TERMINATED: 04/24/2018*

**Defendant**

**Sarah Cooper**
*TERMINATED: 04/24/2018*

**Defendant**

**Brad Hompe**                                          represented by  **Rebecca A Paulson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Cindy O'Donnell**                                    represented by  **Rebecca A Paulson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**John and Jane Doe**
*TERMINATED: 07/31/2018*

**Defendant**

**Isaac Buhle**                                        represented by  **Rebecca A Paulson**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 04/04/2017 | 1 | | PRISONER COMPLAINT against All Defendants filed by Rufus West. (Attachments: # 1 Cover letter)(bx) (Entered: 04/05/2017) |
| 04/04/2017 | 2 | | MOTION for Order to Have Filing Fee Paid from Release Account filed by Rufus West. (bx) (Entered: 04/05/2017) |
| 04/05/2017 | 3 | | LETTER from the clerk to plaintiff re Consent/Refusal to Magistrate Judge Nancy Joseph and requesting that the consent/refusal form, IFP, a six month trust account statement and or payment be filed within 21 days (bx) |
| 04/06/2017 | 4 | | LETTER from the Clerk to Rufus West regarding the Prisoner E–Filing Program. (cc: All Counsel) (Attachments: # 1 Prisoner E–Filing Information Packet)(tlf) |
| 04/13/2017 | 5 | | REFUSAL to Consent to Jurisdiction by US Magistrate Judge by plaintiff Rufus West (vkb) |
| 04/13/2017 | 6 | | MOTION for Leave to Proceed Without Prepayment of the Filing Fee by plaintiff Rufus West (vkb) |
| 04/13/2017 | 7 | | Prisoner Trust Fund Account Statement filed by plaintiff Rufus West (vkb) |

| 04/18/2017 | 8 | | ORDER signed by Judge Pamela Pepper on 4/18/2017 DENYING 2 Plaintiff's motion for order to have the filing fee paid from the release account. (cc: all counsel; by US Mail to plaintiff) (pwm) |
|---|---|---|---|
| 04/19/2017 | 9 | | ORDER that on or before 5/12/2017 plaintiff shall forward to the Clerk of Court the sum of $ 29.97 as an initial partial filing fee in this action signed by Judge Pamela Pepper on 4/19/2017. (cc: all counsel; by US Mail to plaintiff and warden at Green Bay CI)(pwm) |
| 05/02/2017 | | | INITIAL PARTIAL FILING FEE Received: $29.97, receipt number MK4689–mk4689065380. ; the payment of all future filing fees will be maintained by the financial department (cms) |
| 06/08/2017 | 10 | | MOTION to Appoint Counsel by Rufus West. (Attachments: # 1 Letter from Counsel)(tlf) |
| 11/17/2017 | 11 | | SUPPLEMENT by Rufus West re 1 Complaint – Prisoner. (mac) |
| 02/22/2018 | 12 | | REQUEST for Status Update by Rufus West. (mac) |
| 03/30/2018 | 14 | | AMENDED ORDER signed by Judge Pamela Pepper on 3/30/2018. 6 Plaintiff's MOTION for leave to proceed without prepayment of the filing fee GRANTED; agency having custody of plaintiff to collect $320.03 balance of filing fee from plaintiff's prison trust account under 28 USC §1915(b)(2). 10 Plaintiff's MOTION to appoint counsel DENIED without prejudice. By end of day 5/4/2018, plaintiff to file amended complaint; failure to file by deadline may result in dismissal of case for failure to prosecute. (cc: all counsel, via mail to Rufus West and Warden at Green Bay Correctional Institution)(cb) (Entered: 04/09/2018) |
| 04/03/2018 | 13 | | ORDER signed by Judge Pamela Pepper on 4/3/2018. 6 Plaintiff's MOTION for leave to proceed without prepayment of the filing fee GRANTED; agency having custody of plaintiff to collect $320.03 balance of filing fee from plaintiff's prison trust account under 28 USC §1915(b)(2). 10 Plaintiff's MOTION to appoint counsel DENIED without prejudice. By end of day 5/4/2018, plaintiff to file amended complaint; failure to file by deadline may result in dismissal of case for failure to prosecute. (cc: all counsel, via mail to Rufus West and Warden at Green Bay Correctional Institution)(cb) |
| 04/24/2018 | 15 | | AMENDED COMPLAINT against Scott Eckstein, Pete Ericksen, Brad Hompe, John Kind, Cindy O'Donnell, CO Buhle, John and Jane Doe filed by Rufus West.(mac) |
| 07/31/2018 | 16 | | ORDER signed by Judge Pamela Pepper on 7/31/2018. Defendants John and Jane Doe and Pete Ericksen DISMISSED. Plaintiff's request to appoint counsel DENIED without prejudice. Defendants Kind, Eckstein, Hompe, O'Donnell and Buhle to file responsive pleading to amended complaint within 60 days. Parties may not begin discovery until the court enters scheduling order setting deadlines for discovery and dispositive motions. (cc: all counsel, via mail to Rufus West at Green Bay Correctional Institution)(cb) |
| 08/09/2018 | 17 | | NOTICE of Appearance by Rebecca A Paulson on behalf of CO Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell. Attorney(s) appearing: Rebecca A. Paulson (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 08/09/2018 | 18 | | |

| | | | |
|---|---|---|---|
| | | | ACCEPTANCE OF SERVICE BY DOJ as to CO Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell (Paulson, Rebecca) |
| 08/22/2018 | 19 | | MOTION to File Second Amended Complaint filed by Rufus West. (Attachments: # 1 Proposed Second Amended Complaint)(kmm) |
| 08/22/2018 | 20 | | COMPLIANCE NOTICE sent to Rufus West re 19 MOTION to File Second Amended Complaint. (tlf) |
| 09/28/2018 | 21 | | ANSWER to 15 Amended Complaint with Jury Demand by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell. (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 12/04/2018 | 22 | | ORDER signed by Judge Pamela Pepper on 12/4/2018 DENYING 19 Plaintiff's Motion to File Second Amended Complaint. (cc: all counsel, via mail to Rufus West at Green Bay Correctional Institution) (cb) |
| 12/04/2018 | 23 | | SCHEDULING ORDER signed by Judge Pamela Pepper on 12/4/2018. Discovery due 4/5/2019; dispositive motions due 5/6/2019. (cc: all counsel, via mail to Rufus West at Green Bay Correctional Institution–with copies of Answers to Prisoner and Pro Se Litigants' Common Questions)(cb) |
| 01/30/2019 | 24 | | MOTION to Compel Discovery by Rufus West. (Attachments: # 1 Discovery communication and responses)(lh) (Entered: 01/31/2019) |
| 02/20/2019 | 25 | | RESPONSE to Motion filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 24 MOTION to Compel . (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 03/20/2019 | 26 | | REPLY BRIEF in Support filed by plaintiff Rufus West re 24 MOTION to Compel (Attachments: # 1 Envelope)(vkb) (Entered: 03/21/2019) |
| 03/21/2019 | | | NOTICE of Change of Address as to Rufus West; per DOC Inmate Locater, Plaintiff was transferred to Redgranite Correctional Institution on 2/15/2019. (tlf) |
| 05/06/2019 | 27 | | TRANSCRIPT of Deposition of Rufus West held on March 11, 2019 (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 05/06/2019 | 28 | | MOTION for Summary Judgment by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell. (Paulson, Rebecca) |
| 05/06/2019 | 29 | | BRIEF in Support filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 28 MOTION for Summary Judgment . (Paulson, Rebecca) |
| 05/06/2019 | 30 | | Proposed Findings of Fact by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell (Paulson, Rebecca) |
| 05/06/2019 | 31 | | DECLARATION of Bradley Hompe (Attachments: # 1 Exhibit 1001– GBCI–2016–15138)(Paulson, Rebecca) |
| 05/06/2019 | 32 | | DECLARATION of Scott Eckstein (Attachments: # 1 Exhibit 1002– West's July 7, 2016 Interview/Information Request Form, # 2 Exhibit 1003– Memo dated July 12, 2016)(Paulson, Rebecca) |
| 05/06/2019 | 33 | | DECLARATION of Cindy O'Donnell (Paulson, Rebecca) |
| 05/06/2019 | 34 | | |

| | | | |
|---|---|---|---|
| | | | DECLARATION of John Kind (Attachments: # 1 Exhibit 1004– DAI Policy 306.17.02 effective 5/1/15)(Paulson, Rebecca) |
| 05/06/2019 | 35 | | DECLARATION of Isaac Buhle (Paulson, Rebecca) |
| 05/06/2019 | 36 | | DECLARATION of Rebecca A. Paulson (Attachments: # 1 Exhibit 1007– West's December 11, 2018 Discovery Request to Buhle)(Paulson, Rebecca) |
| 05/06/2019 | 37 | | DECLARATION of Michelle Smith (Paulson, Rebecca) |
| 05/06/2019 | 38 | | DECLARATION of Alan DeGroot (Attachments: # 1 Exhibit 1005– DAI Policy 500.70.27 effective 4/20/18, # 2 Exhibit 1006– DAI Policy 306.17.02 effective 9/17/18)(Paulson, Rebecca) |
| 05/06/2019 | 39 | | UNPUBLISHED Decision *Garner v. Muenchow, 715 Fed.Appx. 533 (2017)* filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell (Paulson, Rebecca) |
| 05/06/2019 | 40 | | UNPUBLISHED Decision *Kramer v. Pollard, 497 Fed.Appx. 639 (2012)* filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell (Paulson, Rebecca) |
| 05/06/2019 | 41 | | UNPUBLISHED Decision *Riley v. Ewing USDC WDWI 15CV592* filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 05/13/2019 | 42 | | MOTION for Summary Judgment and BRIEF IN SUPPORT filed by plaintiff Rufus West (Attachments: # 1 Envelope)(vkb) |
| 05/13/2019 | 43 | | Proposed Findings of Fact filed by plaintiff Rufus West (Attachments: # 1 Exhibits (bookmarked))(vkb) |
| 05/13/2019 | 44 | | DECLARATION of Thomas Geske (vkb) |
| 05/13/2019 | 45 | | DECLARATION of Keith Hughes (vkb) |
| 06/06/2019 | 46 | | MOTION for Sanctions filed by plaintiff Rufus West (vkb) (Entered: 06/07/2019) |
| 06/06/2019 | 47 | | MOTION for Costs and Fees filed by plaintiff Rufus West (vkb) (Entered: 06/07/2019) |
| 06/06/2019 | 48 | | Additional Proposed Findings of Fact filed by plaintiff Rufus West (Attachments: # 1 Exhibit)(vkb) (Entered: 06/07/2019) |
| 06/06/2019 | 49 | | BRIEF in Opposition filed by plaintiff Rufus West re 28 MOTION for Summary Judgment (vkb) (Entered: 06/07/2019) |
| 06/06/2019 | 50 | | RESPONSE filed by plaintiff Rufus West re 30 Defendants' Proposed Findings of Fact (vkb) (Entered: 06/07/2019) |
| 06/12/2019 | 51 | | BRIEF in Opposition filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 42 MOTION for Summary Judgment . (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 06/12/2019 | 52 | | RESPONSE filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 43 Proposed Findings of Fact (Paulson, Rebecca) |

| 06/19/2019 | 53 | | MOTION to Strike Defendants' Response to Plaintiff's Motion for Summary Judgment filed by plaintiff Rufus West (vkb) |
|---|---|---|---|
| 06/19/2019 | 54 | | MOTION for Default Judgment as to defendants filed by plaintiff Rufus West (Attachments: # 1 Proposed Default Judgment)(vkb) |
| 06/19/2019 | 55 | | AFFIDAVIT of Rufus West in Support of Motion for Entry of Default (vkb) |
| 06/20/2019 | 56 | | REPLY BRIEF in Support filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 28 MOTION for Summary Judgment . (Paulson, Rebecca) |
| 06/20/2019 | 57 | | RESPONSE filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 48 Proposed Findings of Fact (Paulson, Rebecca) |
| 06/20/2019 | 58 | | RESPONSE to Motion filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 46 MOTION for Sanctions . (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 07/01/2019 | 59 | | REPLY BRIEF in Support filed by plaintiff Rufus West re 46 MOTION for Sanctions (Attachments: # 1 Envelope)(vkb) (Entered: 07/02/2019) |
| 07/01/2019 | 60 | | REPLY BRIEF in Support filed by plaintiff Rufus West re 42 MOTION for Summary Judgment (vkb) (Entered: 07/02/2019) |
| 07/01/2019 | 61 | | REPLY filed by plaintiff Rufus West re 52 Defendants' Response to 43 Plaintiff's Proposed Findings of Fact (vkb) (Entered: 07/02/2019) |
| 07/01/2019 | 62 | | REPLY filed by plaintiff Rufus West re 57 Defendants' Response to 48 Plaintiff's Additional Proposed Findings of Fact (vkb) (Entered: 07/02/2019) |
| 07/09/2019 | 63 | | BRIEF in Opposition filed by Isaac Buhle, Scott Eckstein, Brad Hompe, John Kind, Cindy O'Donnell re 53 MOTION to Strike, 54 MOTION for Default Judgment as to defendants . (Attachments: # 1 Certificate of Service)(Paulson, Rebecca) |
| 07/22/2019 | 64 | | REPLY BRIEF in Support filed by plaintiff Rufus West re 53 MOTION to Strike and 54 MOTION for Default Judgment (Attachments: # 1 Envelope)(vkb) (Entered: 07/23/2019) |
| 07/31/2019 | 65 | | MOTION for a Cease and Desist Harassment Order filed by plaintiff Rufus West (Attachments: # 1 Envelope)(vkb) |
| 09/17/2019 | 66 | | ORDER signed by Judge Pamela Pepper on 9/17/2019. 24 Plaintiff's motion to compel DENIED as moot. 46 Plaintiff's motion for sanctions DENIED. 47 Plaintiff's motion for costs and fees DENIED. 53 Plaintiff's motion to strike defendants' response DENIED. 54 Plaintiff's motion for default judgment DENIED. 65 Plaintiff's motion for cease and desist harassment order DENIED. (cc: all counsel, via mail to Rufus West at Redgranite Correctional Institution) (cb) |
| 03/09/2020 | 67 | | ORDER DISMISSING CASE signed by Chief Judge Pamela Pepper on 3/9/2020. 28 Defendants' motion for summary judgment GRANTED. 42 Plaintiff's motion for summary judgment DENIED. (cc: all counsel, via mail to Rufus West at Redgranite Correctional Institution)(cb) |
| 03/09/2020 | 68 | | |

| | | | |
|---|---|---|---|
| | | | JUDGMENT signed by Deputy Clerk and approved Chief Judge Pamela Pepper on 3/9/2020. (cc: all counsel, via mail to Rufus West at Redgranite Correctional Facility)(cb) |
| 03/18/2020 | 69 | | NOTICE of Change of Address as to plaintiff Rufus West to Green Bay Correctional Institution (vkb) (Entered: 03/19/2020) |
| 03/25/2020 | 70 | | LETTER from plaintiff stating he has yet to receive a copy of the closing order and judgment; mailed copies to pltf at GBCI (Attachments: # 1 Envelope)(vkb) |
| 04/08/2020 | 71 | | NOTICE OF APPEAL by Rufus West from USDC re: 68 Judgment, 67 Order Dismissing Case (cc: all counsel)Newlin Notice to be sent by 6/5/2020 (Attachments: # 1 Issues on Appeal, # 2 cover letter)(lh) |

Bismillah ir Rahman ir Rahim. Al-Hamdulillah.

UNITED STATES DISTRICT COURT        EASTERN DISTRICT OF WISCONSIN

Rufus West a/k/a Muslim Mansa Lutalo Iyapo,

        Plaintiff,

    v.                            Case No. 17-CV-482

John Kind. Warden Scott Eckstein, Brad Hompe,

Cindy O' Donnell, and Isaac Buhle,

        Defendants.

---

## PLAINTIFF'S NOTICE OF APPEAL

---

     Notice is hereby given that Rufus West a/k/a Muslim Mansa Lutalo Iyapo (Plaintiff) in the above-named case hereby appeal to the United States Court of Appeals for the Seventh Circuit from the final judgment in the screening order dated July 31, 2018, denying Muslim's claim under the Fourteenth Amendment; and the final judgment granting defendants motion for summary judgment (Dkt. No. 28), denying Muslim's motion for summary judgment (Dkt. 42) and dismissing case entered in this action on the 9th day of March, 2020.

Dated this 1st day of April, 2020.

Rufus West, #225213       a/k/a      Muslim Mansa Lutalo Iyapo

P.O. Box 19033 (GBCI)

Green Bay, WI 54307

Bismillah ir Rahman ir Rahim. Al-Hamdulillah.

UNITED STATES DISTRICT COURT          EASTERN DISTRICT OF WISCONSIN

Rufus West a/k/a Muslim Mansa Lutalo Iyapo,
              Plaintiff,
        vs.                                Case No. 17-CV-482
John Kind, Warden Scott Eckstein, Brad Hompe,
Cindy O'Donnell, and C.O. Buhle,
              Defendants.

## PLAINTIFF'S ISSUES ON APPEAL (CONT.)

1. Denial of being allowed to proceed on Equal Protection claim.

In the Court's screening order dated July 31, 2018, the court
denied Muslim's claim that the defendants' actions violated his
Fourteenth Amendment right to not be discriminated against because
of his Faith, denying him equal protection of the laws. (See July
31, 2018 decision pgs. 11-12) By denying Muslim's claim under the
Fourteenth Amendment, the court essentially handicapped Muslim's
opportunity to defend against the defendants' defense of equal
protection/discrimination. The court's denial gave the defendants
a clear path out of being held accountable for their actions by
relying on the Fourteenth Amendment's anti-discrimination/equal
opportunity claim.

Furthermore, the defendants' actions violated Muslim's rights
under the Fourteenth Amendment as they discriminated against him
because of his Faith by allowing a female staff member posing as
a male to view his nakedness. And also violated Muslim's Equal
Protection rights by allowing C.O. Buhle's want to be a male to
trump Muslim's rights to not be viewed by a female.


2. The Court erred when it granted the defendants' summary judgment
motion finding that Muslim wasn't substantially burdened.

The Court stated that it agreed that "even if Buhle saw plaintif
naked on July 2, 2016, that _single_ incident did not substantially
burden the plaintiff's exercise of his religion. (R. 67:21) The
Court cited previous court decisions regarding repeated incidents
that violated the RLUIPA. (Ibid. 21-23)

-1-

Muslim contends that the Court erred because there is nothing in the RLUIPA that requires that the violation involved has to be more than one incident in order to constitute a substantial burden. Additionally, there is nothing in the record to show that Muslim will not be strip searched by a female in the near future. According to the defendants' later argument, which the Court agreed, female staff members posing as males have a right to strip search male prisoners under the compelling interest/least restrictive means clause of the RLUIPA. (Ibid. 25-32)

Muslim also asserts that the Court erred by putting itself in a position to decide that Muslim was not substantially burdened per se, by the defendants' actions. The court's are not to make such determinations.

Muslim asserts that the Court erred when it held that the defendants would not continue to allow the defendants to allow female staff members to strip search Muslim.

Muslim asserts that the Court erred when it held that Buhle didn't see Muslim's private parts due to the curtain, and that Muslim agreed that Buhle didn't search him but only observed and looked on, while discarding the existing dispute that Buhle didn't remove herself from standing directly in front of him and watched him. Just because Buhle didn't <u>verbalize</u> the commands associated with the strip search does not mean that she did not violate Muslim's Islamic belief because she observed his nakedness. The Court erred when it decided material disputes that Buhle did not observe Muslim's nakedness during the strip search because of the curtain and because of the strip search policy.

The Court erred when it refused to accept Muslim's supplemental proposed findings of fact about Buhle observing Muslim's nakedness. (R. 67:21)

Muslim asserts that the Court held that its conclusion that the defendants didn't substantially burden Muslim's Islamic belief is bolstered by Muslim limiting his claim to being strip searched by a female instead of being strip searched by both male and female staff members. (R. 67:23-24) Muslim asserts that he is the master of the complaint and thus should not have his claim regarding being strip searched by a female staff member diminished because he didn't include a claim that he was strip searched by males staff members.

-2-

3. The Court erred when it held that the defendants had a compelling interest to violate Muslim's rights because of compliance of the law.

The Court concluded that compliance with the equal protection law at the time of the strip search was compelling enough to usurp Muslim's right to not be strip searched by a female. (Ibid. 26) The Court's conclusion goes against the language of RLUIPA and the intent of the law. (See 42 U.S.C. 2000-3(g); 146 Cong. Rec. §7775 JoiJoint Statement of Sen. Hatch and Sen. Kennedy.) (July 2000) (RLUIPA's heightened protection stemmed from Congress' recognition that the right of inmates )and other institutionalized persons) to practice their faith is "at the mercy of those running the institution.") As the Supreme Court has stressed, inmates are subject to a degree of (governmental) control unparalleled in civilian society and severely disabling to private religious exercise." Cutter v. Wilkinson, 544 U.S. ___ at 720-721. Congress thus passed RLUIPA to afford this confined population greater protection of religious exercise than what the Constitution itself affords.

The Court erred when it held that the DOJ's guidance on allowing female staff posing as males to strip search male prisoners was sufficient to prove that such guidance was aimed at ensuring that the defendants didn't violate PREA laws. The guidance goes against the PREA laws, DOC rules, RLUIPA, the First Amendment, and the Fourteenth Amendments.

The Court erred when it stated that Muslim implied that the defendants could avoid violating his right to be free from being strip searched by a female staff by refusing to hire females posing as males. (R. 67:28) Muslim never contended such.

4. The court erred when it held that effective prison management allows the defendants to violate Muslim's right not to be strip searched by female staff members.

The Court erred by holding that Buhle is allowed to violate Muslim's right to not be strip searched by a female staff member because of prison management reasons. (R. 67:29) The record shows that for decades the DOC has effectively managed its prisons for the argument of preventing female staff from partaking in females strip searching male prisoners and/or viewing the male prisoners' nakedness during strip searches. Thus, there's no reason why Buhle, a female posing as a male, should be exempted from complying with

the DOC's rules that were already in place. The record also shows that, if the defendants are to be believed, their own strip search policy requires that a prisoner be strip searched by two staff members. Thus, there will never be a situation where Buhle will need to directly view Muslim's nakedness outside of an emergency situation.

5. The Court erred when it held that the defendants had a compelling interest under the medical privacy.

The Court erred when it held that the defendants' medical privacy argument is sufficient to justify violating Muslim's right to not have a female posing as a male to strip search him. (R. 67:30-32)

6. The Court erred when it held that the defendants did not violate his First Amendment right for the same reasons that Muslim argues that the defendants should not have been granted summary judgment on his RLUIPA claims.

The Court erred when it held that Muslim's First Amendment free exercise claim fails for the same reasons that his RLUIPA claim failed. (Ibid. at 33-36) Muslim asserts that for the same reasons that he argues that his RLUIPA claims should not have been dismissed, his First Amendment free exercise claim should not have been dismissed. The record shows that Buhle observed Muslim naked during the strip search and didn't move from the front of the strip search booth viewing his nakedness during the whole strip search. The record shows that there's no legitimate penological interest "prison management and administration" (Ibid. at 34) to justify allowing Muslim's right to be violated via allowing a female posing as a male to strip search him, as there are already rules in place, and have been in place for decades that prevented such searches. And finally, the Court erred when it held that the defendants didn't violate Muslim's rights under the Turner v. Safley, 482 U.S. 78, 89-91 (1987). There clearly was no alternative available to not being strip searched by a female.

6. The Court erred when it granted the defendants' summary judgment on Muslim's failure to intervene claim.

The Court erred in holding that Hompe and O'Donnell were justified in failing to intervene because Muslim's RLUIPA and First Amendment claims were dismissed. (Ibid. at 36) Muslim contends that because

the defendants should not have been granted summary judgment on
Muslim's RLUIPA and First Amendment claims, the claims against Hompe
and O'Donnell should not have been dismissed.

## CONCLUSION

Based on the foregoing, Muslim presents these issues on appeal
in support of Affidavit Accompanying Motion For Permission To Appeal
In Forma Pauperis.

Dated this 1st day of April, 2020.

Rufus West,#225213          a/k/a     Muslim Mansa Lutalo Iyapo

P.O. Box 19033 (GBCI)
Green Bay, WI 54307

-5-

Bismillah ir Rahman ir Rahim. Al-Hamdulillah.

Date: April 7, 2020

To: Clerk of Court
    Eastern District of Wisconsin
    e-filing.

RE: Rufus West a/k/a Muslim Mansa Lutalo Iyapo v. John Kind,
    Warden Scott Eckstein, Brad Hompe, Cindy O'Donnell, and
    Isaac Buhle. Case No. 17-CV-482.

Dear Clerk,

Be advised that on April 7, 2020, I sent my Notice of Appeal,
my Issues on Appeal to the GBCI Library to e-file to this court.
On this date I also sent my "Affidavit Accompanying Motion for
Permission to Appeal In Forma Pauperis" to the GBCI Business
Office, per their instruction, as proof of need for a certified
copy of my prison trust account statement for the past six
months. Afterwards they will send both documents to the library
to e-filed with you (Insha Allah).

Your attention to this matter will be appreciated.

Sincerely,

Rufus West, #225213          a/k/a   Muslim Mansa Lutalo Iyapo

P.O. Box 19033 (GBCI)
Green Bay, WI 54307

cc: File

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RUFUS WEST,

                    Plaintiff,

        v.                                          Case No. 17-cv-482-pp

JOHN KIND, WARDEN SCOTT ECKSTEIN,
BRAD HOMPE, CINDY O'DONNELL,
and ISAAC BUHLE,

                    Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 28), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 42) AND DISMISSING CASE

---

Plaintiff Rufus West is a prisoner representing himself. The court screened his amended complaint and allowed him to proceed on a claim that defendants Isaac Buhle, John Kind and Scott Eckstein violated his right to freely exercise his religion, subjecting him to pressure to violate his beliefs by submitting to a strip-search in front of, or by, an allegedly female officer. Dkt. No. 16 at 7. The court also permitted the plaintiff to proceed on a Religious Land Use and Institutionalized Persons Act claim based on allegations that Buhle, Kind and Eckstein imposed a substantial burden on his First Amendment free exercise rights and that there was no compelling interest in having Officer Buhle search him or observe the search. Id. Finally, the court allowed the plaintiff to proceed on claims against defendants Brad Hompe and Cindy O'Donnell for allegedly failing to intervene in the violation of the plaintiff's rights. Id. at 10-11.

1

The parties have filed cross-motions for summary judgment. Dkt. Nos. 28, 42.

## I.    Facts

The plaintiff has been a prisoner at Redgranite Correctional Institution since February 2019. Dkt. No. 30 at ¶1; Dkt. No. 43 at ¶¶1, 8. Before that, and on July 2, 2016, the plaintiff was confined at Green Bay Correctional Institution. Dkt. No. 30 at ¶1; Dkt. No. 43 at ¶7. Defendant Officer Isaac Buhle is a correctional officer at Green Bay. Dkt. No. 30 at ¶2; Dkt. No. 43 at ¶4. Defendant John Kind is the security director at Green Bay. Dkt. No. 30 at ¶3; Dkt. No. 43 at ¶2. Defendant Scott Eckstein was the warden at Green Bay during the events described in the complaint. Dkt. No. 30 at ¶4; Dkt. No. 43 at ¶3. Defendant Bradley Hompe is a corrections complaint examiner for the Department of Corrections. Dkt. No. 30 at ¶5; Dkt. No. 43 at ¶5. Defendant Cindy O'Donnell is the policy initiatives advisor and the secretary's designee for the purpose of making final agency decisions on offender complaints filed by inmates under the inmate complaint review system. Dkt. No. 30 at ¶6; Dkt. No. 43 at ¶6.

The plaintiff, who is a male, embraced Islam in 1995. Dkt. No. 43 at ¶¶9,11. The plaintiff asserts that Islamic law prohibits the plaintiff from exposing his nakedness to anybody, but especially to females, as defined by genitalia at birth. Dkt. No. 30 at ¶7; Dkt. No. 43 at ¶12. The plaintiff says that although he has been imprisoned since 1994, he never had been strip searched by a female staff member. Dkt. No. 43 at ¶16.

2

Although Buhle was assigned female at birth, he identifies as a man. Dkt. No. 30 at ¶12. Green Bay hired Buhle as a male officer in January 2016. Id. at ¶35. Kind and Eckstein consulted with Human Resources when Buhle was hired and were told that he should be "treated based on the gender by which he identified." Id. When he was hired, Buhle was told his duties would include all the duties of a male officer, including performing routine strip searches as needed. Id. at ¶36. The defendants assert that the plaintiff assumed, when Buhle started at Green Bay, that Buhle was a woman based on Buhle's voice and appearance. Id. at ¶37.

On July 2, 2016, the plaintiff had a visit with a friend. Dkt. No. 30 at ¶8; Dkt. No. 43 at ¶19. Afterward, he went to the strip search area for a routine strip search under a policy requiring that all prisoners are strip searched after contact visits with people from the street. Dkt. No. 43 at ¶19. Several officers were conducting strip searches. Id. On July 2, 2016, he strip search room at Green Bay contained several stalls to protect inmates' privacy. Dkt. No. 30 at ¶16. Each stall had a curtain in the front to obscure inmates' private areas from view by people other than the officer performing the strip search. Id.

Buhle does not recall the July 2, 2016 strip search incident the plaintiff described in his complaint. Dkt. No. 35 at ¶13. The plaintiff describes the incident as follows:

> When it was [the plaintiff's] turn to be strip searched, he was the last prisoner to be strip searched and the prisoners who were present in the area were finishing getting dressed. It was during this time that [the plaintiff] was approached by Buhle who attempted to strip search him by ordering him to strip. [The plaintiff] asked her how was she able to do that and she responded, "I'm a dude." [The

3

plaintiff] looked at the male officers to see if this was a prank. They looked at [the plaintiff] and then looked at the floor in order to avoid eye contact with him. [The plaintiff] turned back to address Buhle, realizing that it was not a prank and started to panic because he knew that Buhle was a female based on her female features (breasts, face, voice and demeanor, and addressing her in the past as "Ms." or "ma'am") and that exposing his nakedness to her would be in violation of his Islamic beliefs, and also that if he refused to comply with the strip search he would be subjected to the abuse and humiliation based on past experience that would result from staff forcibly strip searching [the plaintiff] by cutting all of his clothes off; physically examining his body by touching him everywhere-including under his penis, around his testicles, and in between his buttocks by spreading them; and then locking him up in punitive segregation. [The plaintiff] repeated his question to Buhle and she answered the same. [The plaintiff's] panic intensified. He humiliated himself by nervously asking the male officers, who had by this time huddled close together adjacent to her, would one of them please strip search him, which one of them did while she looked on and observed.

Dkt. No. 43 at ¶20; Dkt. No. 30 at ¶¶9-10, 27-34. The defendants don't dispute much of this, but assert that the plaintiff hasn't demonstrated that if he'd refused, things would have happened as he says, and they dispute that Buhle observed the strip search. Dkt. No. 52 at ¶20. The defendants also state that if Buhle _had_ observed, he would have been watching the officer who performed the strip search, not the plaintiff. Id.

In the plaintiff's additional proposed findings of fact, filed in response to the defendants' motion for summary judgment, the plaintiff adds to his description of the strip search. Dkt. No. 48. He states that after the other officer stepped in to strip search him, the officer asked the plaintiff, while Buhle was standing right there, "What's going on?" Dkt. No. 48 at ¶62. The

4

plaintiff states that he responded, "It's against my religion for her to see me naked."[1] Id.

On July 7, 2016, the plaintiff submitted an Interview/Information Request to Kind and Eckstein to request an "Exemption from exposing nakedness to the opposite sex [. . .] because it's against Islam." Dkt. No. 43 at ¶23. Several days later, Eckstein responded:

> I am in receipt of your correspondence received 7-7-16 regarding your concerns about a recent strip search.
>
> I have reviewed your correspondence and have also discussed your concerns with our Security Director. I have reviewed the situation and the officer in question is a male and is qualified to complete these duties. If in the future you are directed to submit to a strip search by this individual or any other male staff member it is my expectation that you will comply.
>
> I trust that this correspondence has addressed your concerns, if you do not agree with my decision please feel free to contact the inmate complaint examiner.

Dkt. No. 43 at ¶24; Dkt. No. 43-1 at 3. Kind responded separately and denied the plaintiff's request, stating, "This person is a male and any further issues on this will result in discipline for you." Dkt. No. 43 at ¶25; Dkt. No. 43-1 at 5.

---

[1] The defendants object to the proposed finding with respect to the plaintiff's assertion that he stated his religious objection during the strip search because it relies on a declaration which contradicts prior sworn testimony (citing Kalis v. Colgate-Palmolive Co., 231 F.3d 1049, 1055 (7th Cir. 2000)). Dkt. No. 57 at ¶62. Specifically, the defendants argue that the plaintiff described the strip search in detail at his deposition and never claimed to have asserted on that day that it was against his religion for Buhle to see him naked. Id. Without waiving that objection, the defendants dispute that the plaintiff stated a religious objection during the strip search. Id. Buhle does not recall any inmate ever explicitly stating an objection based on the inmate's religious beliefs. Id.

The plaintiff filed an inmate complaint regarding the denial of his request for an exemption from exposing his nakedness to the opposite sex. Dkt. No. 43-1 at 7-10; Dkt. No. 31-1 at 11-14. The institution complaint examiner recommended dismissal of the complaint because "[t]he Wisconsin Department of Corrections has determined that the Officer is able to conduct strip searches as supported by the Department of Justice National PREA [Prison Rape Elimination Act of 2003] standards for adult prisoner and jails (§115.15)." Dkt. No. 43-1 at 11; Dkt. No. 31-1 at 2. The plaintiff appealed, and on September 13, 2016, the corrections complaint examiner, Hompe, recommended dismissal of the appeal, stating that

> [t]he institution's decision reasonably and appropriately addressed the issue raised by this inmate. On appeal, the inmate presented no information to warrant a recommendation overturning that decision. GBCI completes strip searches in accordance with DOC 306 and DAI Policy 306.17.02. It is also noted the Warden had previously addressed the inmate's concern via a correspondence to the inmate. It is recommended this appeal be dismissed.

Dkt. No. 43-1 at 14; Dkt. No. 31-1 at 6. O'Donnell accepted Hompe's recommendation and dismissed the plaintiff's appeal. Dkt. No. 43 at ¶47.

The plaintiff asserts that he was so distraught about being forced to expose his nakedness to the opposite sex during the strip search and future strip searches that on July 14, 2016 he sought psychological help from Green Bay's psychological services. Id. at ¶28.

The Wisconsin Department of Corrections (DOC) Division of Adult Institution (DAI) Policy and Procedures permits strip searches under six conditions, including before or after a visit. Dkt. No. 30 at ¶13. The DAI Policy

provides that during a strip search, an inmate undresses completely and exposes all body orifices for visual inspection. Id. at ¶18. Each strip search requires two officers: one to directly observe the inmate during the strip search and one to observe the strip search from a side position, or an L position. Id. The officer observing the strip search from the side is typically handed the clothing and searches through it while the main officer maintains focus on the inmate to ensure contraband is not dropped or swallowed during the search. Id. DAI Policy provides that the officer performing the strip search visually inspects the inmate's hair, ears, mouth and the entire body (including armpits, hands, pubic region, between toes, soles of the feet, anus and inner portion of legs). Id. at ¶19. Inmates are asked to lift breasts and/or genitals, if appropriate. Id.

DAI Policy 306.17.02 prohibits female officers from strip searching male inmates, and male officers from strip searching female inmates, except in exigent circumstances. Dkt. No. 30 at ¶¶11, 20. DAI policy mimics standards promulgated by the U.S. Department of Justice on May 12, 2012, under the PREA. Id. at ¶21. To comply with PREA, 28 U.S.C. §115.15(a), cross-gender strip searches are prohibited "except in exigent circumstances or when performed by medical practitioners." Dkt. No. 30 at ¶21.

Neither DAI policy nor PREA regulations explicitly consider transgender staff with respect to strip searches. Id. at ¶22. The defendants indicate, however, that the U.S. Department of Justice has issued guidance on the issue, responding to the question: "What gender should transgender staff be

7

considered for the purposes of complying with cross-gender viewing and searching prohibitions established in standard 115.15?"[2] Id. The DOJ responded that individualized determinations should be made based on the identified gender of the staff member:

> Facilities should verify whether there are any specific legal authorities, statutes, or personnel policies that may be relevant to this determination. Absent any specific authorities, facilities should make an individualized determination based on the identified gender of the staff member, and not solely on the basis of the biological gender. This decision should be made at the request of, and in conjunction with, the transgender staff member. The determination may also change during the course of employment, as part of an on-going adjustment process, or as the staff member gains real-life experience living as a person of the identified gender.[3]

Id. at ¶23.

Although DAI policy does not account for transgender staff, it does have a provision for strip searching transgender inmates. Id. at ¶24. If a transgender man is housed in a male facility, he can be strip searched only by male officers. Id. Likewise, transgender women housed in female facilities can be strip searched only by female officers. Id. A transgender man is a person who was assigned female at birth and now identifies as male. Id. at ¶25. A transgender woman is a person who was assigned male at birth and now identifies as female. Id. Transgender and intersex inmates are placed in housing

---

[2] The PREA defines "transgender" as "a person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth." 28 C.F.R. §115.5.

[3] See https://www.prearesourcecenter.org/node/3261 (last visited March 3, 2020). The question and the DOJ's guidance appear on the web site of the National PREA Resource Center. The date above the question is April 23, 2014.

8

assignments on a case-by-case basis, considering the inmate's health and safety, programming, management and security concerns. Id.

The plaintiff's maximum discharge date (the date by which he must be released from prison) is September 10, 2024. Dkt. No. 30 at ¶42. The Human Resources director at Redgranite testified that she knows of no transgender staff currently working there. Id. at ¶44. While the plaintiff has been at Redgranite for the past year, he has been imprisoned at Green Bay on three separate occasions since 1998. Dkt. No. 48 at ¶76.

According to the defendants, the State has a compelling interest in having a bright-line rule as to which staff can perform strip searches for the sake of prison management. Dkt. No. 30 at ¶56. First shift at Green Bay has about sixty-nine uniform staff posts, and second shift has about fifty-six uniform staff posts. Id. These staff members are located throughout the institution with different areas of responsibility and supervision. Id. To ensure that consistent strip searches are performed and completed in a timely manner, there are identified positions that are assigned to complete this job task. Id. The defendants state that it would be logistically impossible to manage post assignments if an inmate could dictate who could strip search him based on whether the person conforms to binary definitions of gender. Id.

The defendants also state that if specific duties were dependent on a staff member's private medical information, inmates could determine personal information about staff that should remain confidential. Id. at ¶57. If inmates knew a staff member's personal medical and mental health history, it would

9

put the staff member at risk of harassment and abuse, and make the staff member vulnerable to manipulation by inmates who could threaten to blackmail the staff member with the information. Id. The defendants also assert that if transgender staff were not permitted to perform their duties based on their gender identity, it could create liability for the State, violate the staff's rights, complicate post assignments, provide inmates with ways to circumvent strip searches and reveal staff's sensitive medical information. Id. at ¶58.

The defendants assert that the plaintiff possesses all the items he needs to be able to pray. Id. at ¶61. He has four Qurans, other religious texts, a kurta shirt, a kufi cap, a Mishquat, vicar beads, an Islamic ring, a shawl, prayer oil and a prayer rug. Id. at ¶62. He is able to pray five times per day as required by his religion. Id. at ¶63. The plaintiff also attends weekly Jum'ah services and weekly study groups. Id. at ¶64.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A

10

dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

> B.    Discussion

> 1.    *RLUIPA Claim*

RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution," unless "that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," § 2000cc–5(7)(A), but "a prisoner's request for an accommodation must be sincerely based on a religious belief and

11

not some other motivation." Holt v. Hobbs, 574 U.S. 352, 135 S. Ct. 853, 862

(2015) (citing Burwell v. Hobby Lobby, ___ U.S. ___, 134 S. Ct. 2751, 2774,

n.28 (2014)).

        a.     Mootness

The defendants contend that the plaintiff's RLUIPA claim is moot

because, given that he's no longer housed at Green Bay, there is "virtually no

chance" that he ever will be strip searched by a "female." Dkt. No. 29 at 8. They

claim that because he's been transferred to another prison, the plaintiff "no

longer faces the possibility of being strip searched by Officer Buhle." Id. They

also argue that the plaintiff "cannot show he is likely to be transferred back to

GBCI." Id.

The plaintiff insists that his RLUIPA claim is not moot. Dkt. No. 49 at 4.

He asserts that the defendants "have shown a pattern of transferring him to a

different prison in order to circumvent judicial scrutiny." Id. at 5. He describes

another case he brought in federal court, West v. Grams, 607 F. App'x 561,

566 (7th Cir. 2015), in which he alleged that his First Amendment rights were

being violated at Columbia Correctional Institution because the institution was

not holding Islamic services due to a dearth of outside volunteers. Id. The

plaintiff says that

> [i]n the mist of that case being adjudicated, the defendants
> transferred him to GBCI and then screamed "moot," which the
> district court granted. On appeal, however, the Seventh Circuit
> addressed the defendants' "moot" argument:
>
>> West's lawsuit challenges under RLUIPA is a system-
>> wide Department of Corrections policy [. . . ] unless
>> modified-will apply wherever West is next sent until his

12

release. [W]e are given no reason to conclude that the complaint-of-conduct won't be resumed.

Rufus West a/k/a Mansa Lutalo Iyapo v. Grams, et al., 2015 U.S. Appx. 6690.

Id.

The plaintiff has not sued the State of Wisconsin, and even if he had, "[RLUIPA] does not include suits for damages against a State." Sossamon v. Texas, 563 U.S. 277, 288 (2011). The plaintiff has asserted his RLUIPA claim against five individual employees of the Department of Corrections, four of whom are employed at Green Bay; he has asked the court to enjoin "the Defendants"—these five individuals—"from allowing female staff to strip search him." Dkt. No. 16 at 6.

The Seventh Circuit has explained that a plaintiff seeking injunctive relief must show that, without the injunction, the alleged wrongful conduct could "reasonably be expected to occur." Moore v. Thieret, 862 F.2d 148, 150 (7th Cir. 1988) (quoting Vitek v. Jones, 445 U.S. 480, 487 (1980)). In explaining how courts must consider whether the conduct can "reasonably" be expected to occur in the future, the court explained that

> [t]he doctrine of mootness seeks to preserve the historic conception of the federal courts as agencies for the resolution of disputes on which something tangible—money, freedom, personal safety, reputation, etc.—something more than a desire, understandable as it is, for authoritative legal advice or resolution of difficult and important questions of law—turns. When the something tangible depends on events in the future, the court must estimate the likelihood that those events will occur. If the likelihood is small (it is never zero), the case is moot.

Id. at 150.

13

The alleged misconduct that the plaintiff complains of took place at Green Bay, from whence he has been transferred. "If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred." Higgason v. Farley, 83 F.3d 807, 811 (7th Cir. 1996). "Allegations of a likely retransfer may not be based on mere speculation." Id. A plaintiff who seeks injunctive relief at one facility and then is transferred must show "a realistic possibility that he will again be incarcerated in the same state facility and therefore may be subject to the actions of which he complains [in the current lawsuit]." Maddox v. Love, 655 F.3d 709, 716 (7th Cir. 2011).

The plaintiff has provided the court with what he claims is one example of the defendants transferring him to Green Bay in order to create a mootness problem. He asserts that he was transferred to Green Bay in the middle of the litigation in West v. Grams. The plaintiff filed that lawsuit in the Western District of Wisconsin in mid-October, 2011. West v. Grams, 11-cv-687-slc at Dkt. Nos. 1, 3. At the time he filed that suit, he was incarcerated at Columbia. Id. at Dkt. No. 3, page 1. He alleged that various staff members at Columbia deprived him of his First Amendment rights by prohibiting him from having worship services (Jum'ah services) and study groups (Talim) and prohibiting him from observing Eid al-Fitr. Id. at Dkt. No. 3, page 2. The docket shows that on November 8, 2013, Judge Crocker granted summary judgment in favor of the defendants, denied the plaintiff's motion for summary judgment and

Case 2:17-cv-00482-PP   Filed 04/08/20   Page 28 of 53   Document 73

dismissed the case. Id. at Dkt. No. 102. The clerk entered judgment the same day. Id. at Dkt. No. 103.

The plaintiff asked Judge Crocker to reconsider his decision. Id. at Dkt. No. 105. At that time, the plaintiff still was at Columbia. Id. On May 7, 2014, however—before Judge Crocker had ruled on the motion to reconsider—the clerk received a notice from the plaintiff that he had been transferred to Green Bay. Id. at Dkt. No. 108. Several weeks later, Judge Crocker granted the plaintiff's motion to reconsider Judge Crocker's decision that qualified immunity applied to the plaintiff's RLUIPA claim but dismissed the claim upon reconsideration "because [the plaintiff] has been transferred to a new prison." Id. at Dkt. No. 109, page 2. Judge Crocker found that because the plaintiff had been transferred from Columbia to Green Bay, his RLUIPA claims against the Columbia staff were moot. Id. at Dkt. No. 109, page 7.

On appeal, the Seventh Circuit found that the plaintiff had not presented proof that the defendants moved him from Columbia to Green Bay for the express purpose of mooting his RLUIPA claim. West v. Grams, 607 F. App'x 561, 566 (7th Cir. 2015). The appellate court found that the defendants had expressed concerns about Judge Crocker's qualified immunity decision months before the plaintiff was transferred, and that it was Judge Crocker, not the defendants, who "brought up the question of mootness." Id. The court disagreed, however, that the plaintiff's transfer rendered his RLUIPA claim moot. The court explained:

> Under RLUIPA the remedy available to West was limited to declaratory or injunctive relief. See Sossamon v. Texas, ___ U.S. ___,

15

131 S. Ct. 1651, 1660 . . . (2011); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011); *Nelson v. Miller*, 570 F.3d 868, 886-89 (7th Cir. 2009). And though a prison transfer might moot a claim for injunctive relief if the transfer means that the inmate no longer is laboring under the allegedly unconstitutional policy or practice, *see Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009), that is not the case here. West's lawsuit challenges under RLUIPA a system-wide Department of Corrections policy that applied at Columbia, still applies at Green Bay, and—unless modified—will apply wherever West is next sent until his release. In fact, the defendants do not even assure us that they have no present intention to transfer West back to Columbia in the near future.

Id.

The fact that the plaintiff was transferred from Columbia—where the defendants whom he had sued were employed—to Green Bay during the <u>Grams</u> litigation does not prove that the defendants in *this* case ever have had him transferred for the purpose of creating a mootness problem. The Seventh Circuit found no evidence that the <u>Grams</u> defendants—most of whom worked at Columbia and none of whom worked at Green Bay—had the plaintiff transferred solely to create a mootness issue. The plaintiff has presented no evidence that the defendants in *this* case were involved in his May 2014 transfer from Columbia to Green Bay. The plaintiff has not presented evidence that the defendants in this case or the defendants in <u>Grams</u> have the authority to transfer him from one facility to another.

The question the court must answer, however, is not whether the plaintiff has shown that the defendants he has sued in *this* case are likely to transfer him in order to avoid this or other lawsuits. The question is whether the plaintiff has shown a realistic possibility that he will be re-incarcerated at

Green Bay, where Buhle works. It is true that the plaintiff has been at Redgranite for over a year—since February 15, 2019. Dkt. No. 30 at ¶1. But his maximum discharge date is September 10, 2024. <u>Id.</u> at ¶42. As of the date the court writes this order, the plaintiff has over five years left to serve on his sentence (if he is not released prior to his MR date). The plaintiff asserts that he has been sent to Green Bay three times since 1998. Dkt. No. 48 at ¶76. The Wisconsin Department of Corrections Inmate Locator web site supports that assertion. https://appsdoc.wi.gov/lop/detail.do.

The defendants have not stated that the Department of Corrections will never transfer to the plaintiff back to Green Bay. They assert only that because the plaintiff is not at Green Bay *now,* he is in no danger of being strip searched by Buhle. That argument does not address the question of whether there is a realistic possibility that the plaintiff could be transferred back to Green Bay in the future. Given that the DOC has sent the plaintiff to Green Bay three times in the past twenty-one years, this court cannot conclude that there is no reasonable possibility that he might be transferred there again in the next five years. The court does not agree that the plaintiff's RLUIPA claim is moot.

The defendants also argue that the plaintiff is "not likely to be strip searched by any alleged female at Redgranite." Dkt. No. 29 at 8. In their reply brief, the defendants emphasize that there are no transgender men working at Redgranite. Dkt. No. 56 at 2 (citing Dkt. No. 30 at ¶44). They also argue that it is "highly unlikely that [the plaintiff] will encounter another transgender officer at the Department of Corrections even if he transfers again," given how few

17

people in Wisconsin identify as transgender men (and, implicitly, the fact that even fewer are likely to work for the DOC as prison staff). Id. The court agrees with the defendants that there is a much lesser likelihood that the plaintiff might be searched by a transgender male at facilities other than Green Bay. But there is no dispute that, as of time the parties were filing their briefs, there was a transgender staff member at Green Bay, and the court has found that there is a reasonable possibility that the plaintiff could be transferred there.

The court notes one other thing before moving on. In their brief in support of summary judgment, the defendants state that while "the policies in place technically would allow for a future strip search by a transgender man," it is not reasonable to expect the plaintiff to be subject to such a search under his circumstances. Dkt. No. 29 at 9. The court is not sure which "policies in place" the defendants mean. The parties do not dispute that neither DAI policy nor PREA regulations explicitly consider transgender staff with respect to strip searches. The defendants have explained that the DOJ has "issued guidance" on the issue of what gender transgender staff should be considered for the purposes of complying with "cross-gender viewing and searching prohibitions" under the PREA. Dkt. No. 30 at ¶¶22, 23. But the defendants have not asserted that it is DOC policy to follow that guidance, or even that it is Green Bay's or Redgranite's policy to follow that guidance. And even if the DOC officially follows the DOJ's guidance, that guidance provides only that in the absence of a specific statute, rule or regulation, each individual facility should make its own, individualized determinations about transgender staff. The court

assumes the defendants must mean that if the DOC follows the DOJ guidance, it is possible that facilities other than Green Bay could, if they had transgender male employees, decide to treat that employee as male for the purposes conducting and viewing searches.

### b. Substantial Burden

> RLUIPA prohibits the government from imposing a substantial burden on the religious exercise of a person residing in or confined to an institution unless the burden furthers a compelling governmental interest through the least restrictive means. *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). "[T]he plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens the exercise of that religion." *Koger v. Bryan*, 523 F.3d 789, 796 (t7h Cir. 2008). Once a plaintiff has established that *prima facie* case, the burden shifts to the defendant, who must show that its practice is the least restrictive way of furthering a compelling government interest. *Id.*

Howard v. Ministries, No. 14-C-1464, 2017 WL 6507091, at *7 (E.D. Wis. Dec. 18, 2017). The plaintiff's litigation history demonstrates that he seeks to engage in the exercise of his Islamic faith, and the defendants do not dispute that.

The defendants argue, however, that the plaintiff cannot show that the July 2, 2016 search or the "policy" of treating staff based on the gender by which they identify themselves substantially burdened his exercise of that religion.[4] Dkt. No. 29 at 9. RLUIPA itself does not define what it means by "substantial burden." The Supreme Court has held that conduct constitutes a

---

[4] The court puts the word "policy" in quotes because, as it has discussed, the defendants are not clear on whether there is a policy, and if so, whether it is an institution-specific policy or a DOC policy.

Case 2:17-cv-00482-PP    Filed 04/08/20    Page 19 of 33    Document 78

substantial burden when it requires a person to "engage in conduct that seriously violates [his] religious beliefs." Holt v. Hobbs, 574 U.S. 352, 135 S. Ct. 853, 862 (2015) (quoting Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 720 (2014)). The Seventh Circuit has observed, however, that this definition "leaves a lot of uncertainty." Schlemm v. Wall, 784 F.3d 362, 364 (7th Cir. 2015).

> How is a court to tell whether a given restriction "seriously" violates or contradicts religious beliefs? What, indeed, does "seriously" mean?—more than "modestly" and less than "overwhelmingly," but there's a lot of space in that range.

Id. at 364-65. Even in the face of that uncertainty, however, the Seventh Circuit has read the Supreme Court's decisions in Holt (and the case the Holt Court cited, Hobby Lobby) to mean that "RLUIPA's substantial burden inquiry robustly supports inmate religious practice—it specifically *disapproved* of the practice of offsetting against the burden imposed by the rule any other religious accommodations offered or the strength of the religious command." Jones v. Carter, 915 F.3d 1147, 1150 (7th Cir. 2019).

The defendants argue that the plaintiff cannot show that his religious practice was substantially burdened by the July 2, 2016 search because Buhle didn't strip search the plaintiff. Dkt. No. 29 at 10. While Buhle attested in his declaration that he didn't remember the incident, the defendants assert that Buhle "only observed the staff member who was doing the strip search." Id. They say that in that role, Buhle wouldn't have been able to see the plaintiff's "private parts due to the curtain." Id. The plaintiff agrees that Buhle didn't search him (at his request) but says that Buhle "looked on and observed." Dkt.

Case 2:17-cv-00482-PP   Filed 04/08/20   Page 20 of 53   Document 73

no. 43 at ¶20. His supplemental proposed findings of fact assert that Buhle "observed [his] nakedness" during the search. Dkt. No. 48 at ¶62. He reiterated this assertion in his response to the defendants' response to his proposed findings (a pleading that this court doesn't allow, but that's another discussion). Dkt. No. 61 at ¶20. The defendants concede in their reply brief that the parties dispute this fact. Dkt. No. 56 at 2-3.

The defendants contend, however, that even if Buhle saw the plaintiff naked on July 2, 2016, that single incident did not *substantially* burden the plaintiff's exercise of his religion. Id. at 3. The court agrees. The plaintiff was at Green Bay from May 2014 through February 2019. Green Bay hired Buhle in January 2016, dkt. no. 30 at ¶35; the incident at issue took place six months later, in July 2016. The plaintiff has asserted that the July 2, 2016 search was the first time in his history of imprisonment that he'd ever heard of such a thing happening. Dkt. No. 43 at ¶22. He has asserted that though he has been in custody since 1994, he never had been strip searched by "a female staff member." Id. at ¶13. The plaintiff signed his complaint on March 29, 2017, dkt. no. 1 at 7, nine months *after* the July 2, 2016 incident, but made no reference to any other search involving Buhle. There is no evidence that the plaintiff was strip searched in Buhle's presence on more than one occasion.

In this respect, the plaintiff's claim differs from other claims in which courts in this circuit have found that prison staff substantially burdened an inmate's free exercise of his religion. In Schlemm, the Seventh Circuit reversed a district court's grant of summary judgment in favor of the defendants on the

21

Native American plaintiff's claim that the institution's refusal to provide traditional foods at the annual Ghost Feast violated RLUIPA. Schlemm, 784 F.3d at 365-66. The defendants in Schlemm had repeatedly refused to provide traditional foods at a feast that took place every year to a defendant who had been in custody since 1999. In Ajala v. West, 106 F. Supp. 3d 976 (W.D. Wis. 2015), Judge Barbara Crabb concluded that the prison's prohibition against prisoners wearing religious headgear outside their cells imposed a substantial burden on the plaintiff under RLUIPA, because his beliefs required him to wear a kufi cap at all times. This was an on-going, continuous practice by the institution; every day, they required the plaintiff to remove the kufi cap when he wasn't in his cell. In Walker v. Scott, No. 13-3153, 2015 WL 5450497 (C.D. Ill. Sept. 15, 2015), the court found that the prison's refusal to grant the Muslim plaintiff's request for Halal or Kosher meals substantially burdened his exercise of his religion—again, an on-going burden imposed at every meal. See also, Jones, 915 F.3d at 1150 (institution's refusal to provide Muslim inmate with Halal diet that included meat imposed a substantial burden under RLUIPA). In Aiello v. West, 207 F. Supp. 3d 886 (W.D. Wis. 2016), Judge Conley found that the institution imposed a substantial burden on the Jewish plaintiff's exercise of his religion when it stopped holding in-person, group Shabbat services (which it had not held for over a year). Judge Peterson found in Tanksley v. Litscher, No. 15-cv-126-jdp, 2017 WL 3503377 (W.D. Wis. 2017) that prohibiting an inmate who practiced the Hermetic Order of the Golden

Case 2:17-cv-00482-PP   Filed 04/08/20   Page 36 of 53   Document 78

Dawn from using a particular tarot card deck imposed a substantial burden on his religious practice.

In each of these cases, the institution implemented a policy that consistently and repeatedly prevented the inmate from exercising his religion. Whether the institution burdened the inmate's religious exercise every year (Schlemm), every week (Aiello), every day (Ajala) or several times a day (Walker), the burden was repeated and on-going. In contrast, the plaintiff has not asserted that the policy of strip searching inmates after they have outside visitors substantially burdens the exercise of his religion[5]. He has not asserted that Green Bay's hiring of a transgender staff member substantially burdened his religious exercise. He has not alleged that Buhle was assigned to participate in all strip searches. He has alleged that on a single occasion, the institution's policy of strip searching inmates after visits was implemented by staff which included a transgender staff member, that he asked that the transgender staff member not conduct the search, that the transgender staff member complied and did not conduct the search and that the transgender staff member saw him naked.

The court's conclusion is bolstered by the plaintiff's own assertions that his religion forbids him from "exposing his nakedness . . . to anyone except his wife." Dkt. No. 43 at ¶12; Dkt. NO. 42 at 1. He indicates that in a hadith (a saying of the Prophet), the Prophet stated that "[a] man should not see the

---

[5] Though he does dispute the defendants' contention that "strip searches are generally necessary." Dkt. No. 50 at ¶45.

private parts of another man, and a woman should not see the private parts of another woman." Id. at ¶37. In his opposition brief, the plaintiff asserted that because he is Muslim, "it is obligatory for him to protect his nakedness from men and women and that the only person whom he is allowed to expose himself to is his wife." Dkt. No. 49 at 6. He asserts that "[w]hether the person is a male or female, Islam prohibits [the plaintiff] from exposing his nakedness to anyone but his wife, so that is what [the plaintiff] believes." Id. at 7.

Given the plaintiff's own statements that it violates his religious beliefs for him to be seen naked by people of any gender if those people are not his wife, he cannot establish that a single incident of a transgender man seeing him naked imposed a substantial burden on the exercise of his religion. The plaintiff has not argued—as one might expect if he believes that being naked in front of anyone but his wife violates his religious beliefs—that *any* strip search conducted by *anyone* of *any* gender imposes a substantial burden on the exercise of his religion. It is not clear why being seen naked by a transgender person imposes more of a burden on the plaintiff's religious exercise than being seen naked by a person who was born with male physiology.

Even under the less stringent, post-Holt standard, the court cannot conclude that this single incident constituted a "substantial burden" on the plaintiff's exercise of his religion, or that the plaintiff has stated a *prima facie* case that the defendants violated his rights under RLUIPA.

24

c.      Compelling Interest/Least Restrictive Means

In an abundance of caution, the court considers whether, if the plaintiff *had* demonstrated that the incident constituted a substantial burden on the exercise of his religion, the defendants would have met their burden of showing that they had a compelling government interest in having Buhle participate in the July 2, 2016 search and that having him do so was the least restrictive means for serving that interest.

The defendants assert that they had several compelling interests in Buhle's participation in the July 2, 2016 search. They argue that the state has a compelling interest in complying with Title VII of the Civil Rights Act of 1964 and in not violating an employee's rights under the Equal Protection Clause. Dkt. No. 29 at 12-13. They also argue that the state has a compelling interest in efficient prison management. Id. at 14-15. Finally, they argue that the state has a compelling interest in protecting the medical privacy of employees— particularly prison staff. Id. at 15.

i.      **Compliance with the law**

At present, the Supreme Court has not decided the question of whether Title VII of the Civil Rights Act prohibits discrimination against transgender people. On April 22, 2019, it accepted *certiorari* in that question in R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C., ___ U.S. ___ 139 S. Ct. 1599 (Mem), 2019 WL 1756679 (2019). Nor has the Seventh Circuit decided this question, despite the defendants' assertion to the contrary. In Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education, 858 F.3d 1034,

25

1049 (7th Cir. 2017), the Seventh Circuit noted that "[s]everal district courts have . . . [found] that a transgender plaintiff can state a claim under Title VII for sex discrimination on the basis of a sex-stereotyping theory." (Citations omitted.) But the court did not adopt that holding, because it was not considering a Title VII claim. The Whitaker court was considering whether the transgender plaintiff had demonstrated that he had a probability of success on the merits of at Title IX claim. As far as the court can tell, as of the July 2, 2016 search incident, there was no controlling federal precedent holding that Title VII prohibits discrimination against transgender people. The fact that the defendants want to avoid violating Title VII is commendable, but it is not clear that in July 2016, that desire would have provided them with a compelling interest to have Buhle participate in cross-viewing and searches.

The defendants' assertion that they had a compelling government interest in avoiding violations of staff equal protection rights may have more traction. Prior to July 2, 2016, there were federal courts within the Seventh Circuit which had concluded that a transgender person who argued that he or she was treated differently than others based on their transgender status had a colorable equal protection claim. See, e.g., Brown v. Godinez, No. 15-cv-115-JPG, 2015 WL 1042537 (S.D. Ill. Mar. 5, 2015); Johnson v. Robinson, No. 15-cv-298-SMY, 2015 WL 1726965 (S.D. Ill. Apr. 13, 2015). The Department of Corrections may have been aware in the summer of 2016 that treating transgender staff differently than non-transgender staff could give rise to claims under the equal protection clause.

It is very likely that by July 2, 2016, the defendants were aware of the DOJ guidance on treatment of transgender staff in conducting cross-views and searches in a way that would not violate PREA. The DOJ guidance is dated in 2014. When Buhle was hired in January 2016, Eckstein and others asked the human resources department (presumably of the DOC) about the assignment of gender-specific duties to Buhle. Dkt. No. 32 at ¶5. The human resources department responded that if an employee identified as a certain gender, institution management "should respect that and assign duties accordingly." Id.

In Holt, the Supreme Court stated that application of the compelling interest test "contemplates a '"more focused"' inquiry and '"required the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."'" Holt, 574 U.S. at 863 (quoting Hobby Lobby, 134 S. Ct. at 2779)). A court must look at the harm that the defendants allege would be caused by giving an exemption to the plaintiff and balance it against the interest in enforcing the challenged government action—the defendants' assignment of Buhle to conduct searches—in the plaintiff's context. Id.

The court concludes that the defendants could have met their burden of showing that they had a compelling government interest in not violating employees' equal protection rights and in respecting employees' gender identification, even in the plaintiff's specific context. Buhle was hired as a male

27

corrections officer and was told that he'd be performing the same duties as other male corrections officers. He was told that his duties would include all the duties of a male corrections officer, including performing strip searches. Dkt. No. 30 at ¶36. For the defendants to then prohibit Buhle from performing strip searches would have put the defendants at risk for a claim that they were discriminating against Buhle based on his transgender status, even if requiring Buhle to perform those duties ended up imposing a burden on the plaintiff's exercise of his religion on one occasion.

The plaintiff also implies that the defendants could avoid burdening his religious exercise by refusing to hire transgender corrections officers or refusing to allow transgender officers to participate in strip searches. He says that for decades the DOC complied with their own rules that prohibit cross-gender strip searches after visits. Dkt. No. 49 at 12. For the defendants to refuse to hire transgender corrections officers would create the liability risks the court has discussed, as would prohibiting such officers from engaging in the routine tasks performed by non-transgender officers. More to the point, the plaintiff assumes that in his twenty-seven years in custody, he has never been strip searched or seen naked by a transgender person—an assumption which may not be supportable.

The defendants could have met their burden on this compelling government interest.

## ii. **Effective prison management**

The defendants argue that depending on the time of day and the work shift, Green Bay has between fifty-six and sixty-nine uniformed staff members posted throughout the prison. Dkt. No. 29 at 14. They state that to make sure that strip searches are conducted in a consistent and timely way, certain "positions" are assigned to conduct the searches. Id. They argue that if inmates were able to decline a search based on their perception of the searching staff member's gender, it would be "logistically impossible" for them to post assignments. Id.

Buhle is a corrections officer. Corrections officers are required to perform strip searches as needed. Presumably there are many occasions when strip searches are needed—when officers suspect inmates have contraband on (or in) their persons, when new inmates arrive at the institution, after inmates have met with outside visitors. The only way for the defendants to avoid the possibility of Buhle strip searching an inmate whose religious beliefs might be offended, or acting as the observing officer when someone else strip searched an inmate whose religious beliefs might be offended, would be to assign Buhle to a position where he never would be required to participate in strip searches, or to assign him to an area of the prison in which there were no inmates whose religious beliefs might be offended. Even if either of these options were possible, the logistics would constitute more than an effort to save a few dollars and more than a "bureaucratic desire to follow the prison system's rules." Schlemm, 784 F.3d at 365. The court acknowledges that RLUIPA "requires

Case 2:17-cv-00482-PP   Filed 04/08/20   Page 43 of 53   Document 72

prison to change their rules to accommodate religious practices," and that the existence of a rule, in and of itself, "is not a compelling obstacle to change." Id. But the degree of interference with the prison's ability to assign its staff to prevent the possibility that at some point, there might be a need to strip search the plaintiff and Bruhle might be one of the assigned officers in that place at that time, indicates to this court that assigning Bruhle to the same duties as other male officers was the least restrictive means of serving the prison's need for effective management.

### iii.     **Medical privacy of staff**

Finally, the defendants argue that they have a compelling government interest in protecting the privacy of employee medical information. They say that "[i]f specific duties were dependent on the staff's private medical information, inmates are likely to be able to determine personal information about staff that should remain confidential." Dkt. No. 29 at 15. They say that if inmates could learn about a staff member's medical information, it could put that staff member at risk for harassment and abuse, make staff vulnerable to threats of blackmail and could create the potential that inmates could "try to take advantage of a situation in which they can control which staff are permitted to strip search them based on any nuance found in their stated religious beliefs." Id. In their reply brief, the defendants point out that even though the plaintiff claims Buhle was candid with inmates about his transition, the plaintiff had demanded discovery relating to whether Buhle was born with a female physiology. Dkt. No. 56 at 4-5.

30

Most of this argument is unpersuasive. The defendants seem to believe that the only way an inmate might find out about a staff member's medical situation is if staff members with certain medical histories were assigned to certain tasks. Inmates can observe physical conditions. They likely can conclude that a staff member with a hacking, persistent cough is a smoker, or has lung cancer. They likely can conclude that a staff member with a black eye has been in a fight, or has fallen. Inmates can look at a person who has physical characteristics traditionally associated with someone of the female gender and conclude—perhaps correctly, perhaps incorrectly—that that person may not always have identified himself as male. They can make those observations, and draw those conclusions, even without medical records, and even if they are wrong. Inmates likely are capable of finding reasons to harass or abuse or try to blackmail staff members even if they do not have access to the staff members' medical records.

This "medical privacy" argument is actually the defendants' argument that they have a compelling government interest in prison administration, stated in a different way. Prison staff members come in all shapes and sizes, like all humans. Some men may be short and slight and have little facial hair. Some may have visible breasts. Some may seem—to the plaintiff—to behave in what he considers to be "effeminate" ways. The plaintiff himself admits that he objected to Buhle's participation in the search, not because he knew Buhle was transgender, but because having viewed Buhle's physical appearance, the plaintiff believed that Buhle was a woman. Taken to its logical conclusion, the

31

plaintiff could argue that being strip searched, or seen naked, by someone who seems feminine to him substantially burdens his religious practice. He could argue that being seen naked or strip searched by someone whom he perceives to be homosexual imposes a substantial burden on his religious practice. He could, as the court has indicated, argue that being seen naked or strip searched by *anyone* who isn't his wife could substantially burden his religious practice. Such arguments would make it impossible for the defendants—or any other prison officials in any facilities where the plaintiff may be incarcerated between now and his release—to perform their jobs as members of a prison staff.

### d.   Conclusion

While the plaintiff's RLUIPA claim is not moot, he cannot show that the incident on July 2, 2016 imposed a substantial burden on his exercise of religion. Even if he had made such a showing, the defendants have met their burden of proving a compelling government interest in assigning Buhle the same duties as any other male correctional officer (prison administration and management), and have shown that assigning Buhle those duties was the least restrictive means of serving that interest. The court will grant summary judgment in favor of the defendants on the RLUIPA claim.

### 2.   *First Amendment Free Exercise Claim*

RLUIPA provides "expansive protection for religious liberty." <u>Holt</u>, 574 U.S. at 860. It requires prisons that receive federal funding to accommodate sincere religious exercise. <u>Borzych v. Frank</u>, 439 F.3d 388, 390 (7th Cir. 2006)

Case 2:17-cv-00482-PP   Document 86-20   Filed 04/08/20   Page 82 of 73

(citations omitted). In contrast, the First Amendment "does not require the accommodation of religious practice: states may enforce neutral rules." Id. (citations omitted). In other words, "RLUIPA 'confers greater religious rights on prisoners than the free exercise clause has been interpreted to do' . . . ." Neely-Bey Tarik-El v. Conley, 912 F.3d 989, 1004 (7th Cir. 2019) (quoting Grayson v. Schuler, 666 F.3d 450, 451 (7th Cir. 2012)). The Seventh Circuit has concluded that when a plaintiff's "best argument" is his RLUIPA argument, "it is unnecessary to consider the Constitution further." Borzych, 439 F.3d at 390. Other district courts have declined to separately analyze a plaintiff's First Amendment free exercise claim if they determine that his RLUIPA claim did not survive summary judgment. See, e.g., Dangerfield v. Ewing, No. 18-cv-737-jdp, 2020 WL 94758 (W.D. Wis. Jan. 8, 2020).

Here, the plaintiff's First Amendment free exercise claim fails for the same reasons that his RLUIPA claim failed. The defendants contend that the plaintiff's First Amendment claim fails because his ability to practice his religion has not been substantially burdened and because allowing transgender male officers to strip search male inmates is reasonably related to legitimate penological interests. Dkt. No. 29 at 17-19.

Prisoners have a limited right to exercise their religion under the First Amendment. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348-49 (1987); Turner v. Safley, 482 U.S. 78, 89-91 (1987); Tarpley v. Allen Cty., 312 F.3d 895, 898 (7th Cir. 2002). The Seventh Circuit recently reiterated the standard for a free exercise claim:

> To establish a free exercise claim, [the plaintiff] "had to submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." Thompson v. Holm, 809 F.3d 376, 379 (7th Cir. 2016) (citing Hernandez v. C.I.R., 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). The Supreme Court has explained that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas v. Review Bd., 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." Thompson, 809 F.3d at 380 (citing Turner v. Safley, 482 U.S. 78, 89–91, 107 S. Ct. 2254, 96 L.Ed.2d 64 (1987)).

Neely-Bey, 912 F.3d at 1003.

The court already has determined that the plaintiff has not submitted evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices. The plaintiff alleges a single incident in which someone he claims was a woman saw him naked, and argues that this event burdened his exercise of religion despite the fact that Buhle acceded to his request that Buhle not search the plaintiff, Buhle never participated in another search of the plaintiff and the plaintiff himself says that having anyone other than his wife see him naked violates the tenets of Islam.

The court also has determined that the defendants' assigning Buhle the same duties as any other male correctional officer was reasonably related to a legitimate penological interest—prison management and administration. There is a valid, rational connection between the policy of assigning transgender male corrections officers the same duties as other male corrections officers, and a legitimate government interest behind doing so. Accommodation of the

Case 2:17-cv-00482-PP   Filed 04/08/20   Page 48 of 53   Document 78

plaintiff's alleged right to be free from being viewed by a transgender male would have a negative impact on guards, other inmates and the allocation of prison resources. There were no other obvious, easy alternatives to assigning transgender male corrections officers the same tasks as other male corrections officers.

The one factor the court did not consider in analyzing the plaintiff's RLUIPA claim was the question of whether there were alternative means available to the plaintiff to exercise his religion. Turner, 482 U.S. at 89–91. Where an inmate has "other avenues" to exercise the asserted right, the court must "be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" Turner, 482 U.S. at 90 (citing Pell v. Procunier, 417 U.S. 817, 827 (1974)). It is undisputed that the plaintiff had multiple alternative means of exercising his religious rights at Green Bay. He had four Qurans, other religious texts, a kurta shirt, a kufi cap, a Mishquat, vicar beads, an Islamic ring, a shawl, prayer oil and a prayer rug. Dkt. No. 30 at ¶62. He was able to pray five times per day. Id. at ¶63. The plaintiff also attended weekly Jum'ah services and weekly study groups. Id. at ¶64.

This factor is an awkward fit, however, in the circumstances the plaintiff has alleged. He does not allege that the defendants prevented him from taking some affirmative action, such as praying or fasting or attending services. He alleges that the defendants forced him to do something that violates his beliefs. His ability to pray or attend Jum'ah services or fast does not provide an

35

"alternative means" for him to avoid doing something that he claims violates his religious beliefs.

That said, the <u>Turner</u> test is a balancing test, and most of the factors weigh in the defendants' favor. The defendants have demonstrated a rational basis for allowing Buhle, a transgender male officer, to act as the observing officer during the strip search on July 2, 2016. A reasonable factfinder could not conclude that assigning Buhle to conduct and observe strip searches like other male officers, or Buhle's observation of the plaintiff's July 2, 2016 strip search, violated the plaintiffs' right to freely exercise his religion. The defendants are entitled to summary judgment on the First Amendment claim.

### 3. *Failure to Intervene Claim*

The defendants also argue that the court should dismiss the First Amendment claim as to defendants Hompe and O'Donnell because their only involvement was in the grievance process and they committed no underlying constitutional violation. Dkt. No. 29 at 21. The defendants also state that Hompe and O'Donnell were not sufficiently personally involved in the events surrounding the July 2, 2016 search such that they can be held personally liable under §1983, given that their only involvement was in the grievance process. <u>Id.</u> at 21-22.

Because the court has granted summary judgment in favor of the defendants on the RLUIPA and First Amendment claims, there is no underlying constitutional violation in which Hompe and O'Donnell could have intervened. The court will grant summary judgment in favor of Hompe and O'Donnell.

Case 2:17-cv-00482-PP   Document 60   Filed 05/08/20   Page 50 of 53

### III. Conclusion

The court **ORDERS** that the defendants' motion for summary judgment is **GRANTED**. Dkt. No. 28.

The court **ORDERS** that the plaintiff's motion for summary judgment is **DENIED**. Dkt. No. 42.

The court **ORDERS** that this case is **DISMISSED** and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. <u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

Case 2:17-cv-00482-PP   Document 70   Filed 04/08/20   Page 51 of 53

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 9th day of March, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

Case 2:17-cv-00482-PP   Document 86   Filed 03/09/20   Page 38 of 38

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

RUFUS WEST,

        Plaintiff,

        v.

JOHN KIND, SCOTT ECKSTEIN,
BRAD HOMPE, CINDY O'DONNELL,
ISAAC BUHLE, PETE ERICKSON,
BRIAN FOSTER, and SARAH COOPER,

        Defendants.

**JUDGMENT IN A CIVIL CASE**

Case No. 17-cv-482-pp

---

☐    **Jury Verdict.** This case came before the court for a trial by jury. The parties have tried the issues, and the jury has rendered its verdict.

☑    **Decision by Court.** This case came before the court, the court has decided the issues, and the court has rendered a decision.

        **THE COURT ORDERS AND ADJUDGES** that the plaintiff's complaint under 42 U.S.C. §1983, that the defendants violated his constitutional rights, is **DISMISSED**.

        **THE COURT ORDERS** that the defendants' motion for summary judgment is **GRANTED**, dkt. no. 28; the plaintiff's motion for summary judgment is **DENIED**, dkt. no. 42.

        **THE COURT ORDERS** that this case is **DISMISSED**.

        Approved and dated in Milwaukee, Wisconsin this 9th day of March, 2020.

STEPHEN C. DRIES
Clerk of Court

s/ Cary Biskupic
(by) Deputy Clerk

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**